## THE STEAMSHIP APPAM.[1]

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

Nos. 650, 722. Argued January 15, 16, 1917.—Decided March 6, 1917.

The British merchant steamship *Appam,* captured on the high seas by a German cruiser and navigated to a port of the United States in control of German officers and crew, during the war between

---

[1] The docket titles of these cases are: No. 650, *Hans Berg, Prize Master in charge of the Prize Ship "Appam,"* and *L. M. Von Schilling, Vice-Consul of the German Empire, Appellants,* v. *British & African Steam Navigation Co.;* No. 722, Same v. *Henry G. Harrison, Master of the Steamship "Appam."*

Great Britain and Germany, is *held* to have been brought here as a prize.

Under the principles of international law, as recognized by our government since an early day in its history and as emphasized in its attitude in the Hague Conference of 1907, it is a clear breach of our neutral rights for one of two belligerent governments, with both of which we are at peace, to make use of our ports for the indefinite storing and safe-keeping of prizes captured from its adversary on the high seas.

Failure of our government to issue a proclamation on the subject will not warrant the use of our ports to store prizes indefinitely, and certainly not where the possibility of removal depends upon recruiting crews in violation of our established rules of neutrality.

The Treaty with Prussia of 1799, 8 Stat. 172, 173, Article 19, makes no provision for indefinite stay of vessels, and includes prizes only when in charge of vessels of war.

The violation of neutrality committed by a belligerent in wrongfully making use of one of our ports for storing indefinitely a merchant vessel and cargo captured on the high seas, affords jurisdiction in admiralty to the United States District Court of the locality to seize the vessel and cargo and restore them to their private owners.

In such case, proceedings in a prize court of the belligerent country could not oust the jurisdiction of the District Court having the vessel in custody or defeat its judgment.

234 Fed. Rep. 389, affirmed.

THE case is stated in the opinion.

*Mr. Frederick W. Lehmann*, with whom *Mr. John W. Clifton, Mr. Norvin R. Lindheim, Mr. Robert M. Hughes* and *Mr. Walter S. Penfield* were on the briefs, for appellants: [1]

The capture of the *Appam* was a lawful act of war, and vested the property in the ship in the German Empire, as between the parties to this suit, since confessedly no property rights of neutrals or of individual captors are

---

[1] Lack of space prevents a full representation of the interesting arguments made in this case. The reply briefs have suffered especially in the attempt at condensation.

involved. *The Mary Ford*, 3 Dall. 188. As between the belligerents, the capture, undoubtedly, produces a complete divestiture of property. *The Adventure*, 8 Cranch, 221, 226; *The Adeline*, 9 Cranch, 244, 285; *The Astrea*, 1 Wheat. 125; *The Josefa Segunda*, 5 Wheat. 338; *The Sally Magee*, 3 Wall. 451; *The Nassau*, 4 Wall. 635; *Manila Prize Cases*, 188 U. S. 254; Westlake, International Law, vol. 2, 2d ed., p. 309; Wheaton, Maritime Captures and Prizes, c. 9, § 5, p. 259; Mr. Lansing to the English Ambassador, March 13, 1915, Diplomatic Correspondence, European War, Department of State, No. 2, p. 140. The property of a neutral is of course not divested until sentence of condemnation. *Hudson* v. *Guestier*, 4 Cranch, 293, 295.

That jurisdiction of prize cases is vested exclusively in the courts of the captor government, and that the mere entry of a prize into neutral waters is not necessarily a breach of neutrality, are propositions conceded by the appellees.

It is not essential to the jurisdiction of the courts of the captor country that the prize be brought into one of its ports. *Hudson* v. *Guestier, supra; Jecker* v. *Montgomery*, 13 How. 498, 515. The courts of the neutral country may inquire whether the vessel is held as a prize of war, or whether her taking was a violation of the neutrality of their country, but no further. *The Alerta*, 9 Cranch, 359; *The Betsey*, 3 Dall. 6; *The Invincible*, 13 Fed. Cas. 72; *The Invincible*, 1 Wheat. 238. Under all the decisions of this court, when the *Appam* was found to be a prize of war, the libel should have been dismissed, unless it was further found that in the circumstances of the capture itself there was a violation of our neutrality.

Bringing the *Appam* into our waters did not authorize restitution to the original British owners. The breach of neutrality which will forfeit a prize of war must be one which invalidates the capture itself, which involves

the neutral nation as a participant in the act of war committed in taking the prize. If the capture is made in the neutral waters and the prize is brought within the jurisdiction of the sovereign whose neutrality has been violated, restitution will be decreed, because the capture was an act of trespass upon the sovereignty of the neutral power, and moreover, a violation of the shelter and asylum which the captured vessel had a right to expect in the neutral waters.

And of like nature is the case where the captor ship has been equipped, or its equipment has been augmented, within the neutral territory. Bringing the vessel in is not the foundation of the right to redress, it simply gives opportunity to award and enforce redress. The exceptions to the rule as to the exclusive cognizance of prize cases by the courts of the captor country have never been extended to cases of alleged violation of neutrality after the capture, and not inherent in the capture. The policy of our government was fixed and made public during the administration of Washington, and has been adhered to ever since, and the decisions of this court are in perfect harmony with that policy. See Jefferson to British Minister, 1793, 4 Jefferson's Works, H. A. Washington ed., p. 78; Washington to Congress, 1793, 1 Am. State Papers, p. 21; *Talbot v. Jansen*, 3 Dall. 133; *The Alerta, supra,* 359; *The Invincible,* 1 Wheat. 238; *The Divina Pastora,* 4 Wheat. 52; *The Estrella,* 4 Wheat. 298; *The Neustra Senora de la Caridad,* 4 Wheat. 497; *La Amistad de Rues,* 5 Wheat. 385; *La Conception,* 6 Wheat. 235; *The Santissima Trinidad,* 7 Wheat. 283; *The Gran Para,* 7 Wheat. 471; *The Santa Maria,* 7 Wheat. 490; *The Monte Allegre,* 7 Wheat. 520.

Where, as in this case, the capture was a valid act of war, made under the commission of a belligerent power on the high seas, and the capture is complete, the crew of the captured ship submitting to the control of the cap-

tors, and there remains nothing but the hope of recapture, a hope that is not realized, the captured ship is good prize and is the property of the captor government, as much so as are its ships of war, and what its rights or privileges in our ports may be, how long it may stay, or whether it may come into them at all, are questions between our government and the government of the captors, and do not at all concern the original owner of the captured ship.   He has not been injured, he has lost nothing by such acts.   See *The Anne*, 3 Wheat. 435; *The Sir William Peel*, 5 Wall. 517; *The Adela*, 6 Wall. 266; *The Florida*, 101 U. S. 37; *Queen* v. *The Chesapeake*, 1 Oldright (Nova Scotia), 797; *Williams* v. *Armroyd*, 7 Cranch, 423.

The *Appam* is a public ship of the German Empire, and entitled to all the rights and immunities of such a ship.   As the property of the German Government the ship was public property—a public ship—and could be nothing else.   That government might devote her to any use it deemed proper or might destroy her altogether. A ship may be a public ship without being a ship of war. Hall, International Law, 5th ed., p. 161.   The Government of the United States in this war has announced its intention to treat a prize as a public vessel.   Neutrality Proclamation *re* Panama Canal, November 13, 1914, Diplomatic Correspondence, European War, Department of State, No. 2, pp. 18, 19.   Our ports are open to the public ships of friendly powers, and they may remain while our government allows.   *The Exchange*, 7 Cranch, 116.   Their exemption from the jurisdiction of our courts depends rather upon their public than upon their military character.   *Briggs* v. *Light Boats*, 11 Allen, 157, 186.   The general practice of our government has been in harmony with the views we present.   John Paul Jones to Robert Morris, 1783, 7 Diplomatic Correspondence of the United States, p. 288; Franklin to Danish Minister, 3 Wharton,

Diplomatic Córrespondence of the American Revolution, p. 433; Franklin to Jones, 1785, 7 Diplomatic Correspondence of the United States, p. 341; Resolution of Congress of Confederation, October 25, 1787, id., p. 362; Jefferson to Danish Secretary, 1788, 6 Jefferson's Works, Monticello ed., p. 414; Jefferson to British Minister, 1793, 1 Am. State Papers, Foreign Relations, p. 176; 4 Jefferson's Works, H. A. Washington ed., p. 65; Moore's International Law Digest, vol. 7, p. 983; Wheaton to Prussian Minister, 1843, id., p. 982; Cushing to Marcy, 7 Ops. Atty. Gen. 122, 125, 129, 131; Semmes' Correspondence with British authorities, 1864, Semmes' Service Afloat, pp. 663, 741, 743.

In the treaties with Prussia, 1785 and 1799, Art. XIX, the purpose of each party was to obtain shelter for its warships and prizes in the ports of the other. The right of prizes to come into port and their immunity while there constitute the substance of the article, not the manner of coming in or going out. They may "come and enter," and may be "carried out again" at any time. The common and proper use of the word "carry" includes the ideas of *sending* and *bringing*. In *The Felicity*, 2 Dods. 281; *s. c.*, 2 Roscoe's Prize Cases, 233, Sir William Scott used *carry* and *bring* interchangeably. A prize may be brought into port by a prize crew as well as under convoy. *The Alexander*, 8 Cranch, 169; *The Eleanor*, 2 Wheat. 345. The bringing in either case is the act of the captor. In all the correspondence leading up to these treaties we have seen nothing to suggest that on either side it was deemed material whether a prize was brought in alone, by the prize crew, or whether it was brought in by the captor vessel. Everything indicates that it was all one to the parties how the prize got into port so long as it got there. And our commissioners abroad used the words *carry* and *send* indifferently to describe the taking of a prize into port, whether with or without convoy. Franklin to Ver-

gennes, concerning the prizes "sent to Bergen," 1782, 7 Franklin's Works, (ed. John Bigelow), p. 397. In a minute of their proceedings, as ministers plenipotentiary on August 30, 1784, Franklin, Adams, and Jefferson speak of these prizes as taken by Jones and "*carried* into Bergen." 2 Diplomatic Correspondence of the United States, p. 196. Jones himself in a letter to the Marechal de Castries, of February 18, 1784, speaks of them as "*sent* into port." 7 Diplomatic Correspondence of the United States, p. 294. See also Franklin to Jones, 1778, 1 Sparks' Diplomatic Correspondence, American Revolution, p. 361; Jefferson to Baron de Blome, 1786, 2 Jefferson's Works, (ed. H. A. Washington), p. 13; Order of Congress, 1787, 7 Diplomatic Correspondence of the United States, p. 364; Act of March 28, 1806, 6 Stat. 61. The treaty is to be construed in view of the circumstances and conditions which prompted to its adoption. Vattel, Book II, c. 17, § 287; *Hauenstein* v. *Lynham*, 100 U. S. 483; *Tucker* v. *Alexandroff*, 183 U. S. 424. The arrangement with Prussia originated while we were at war with England, and anxious to war on British shipping and safeguard prizes. Prussia had no navy or large maritime interests. The treaty was made out of friendship to this country and at its earnest solicitation. The similar treaty with France of February 6, 1778, Art. XVII, Molloy, vol. 1, p. 474, actuated by the same motive, was construed as allowing prizes to be sent in without convoys. Franklin to Jones, 1779, Senate Reports, 63, 29th Cong., 2d sess., p. 5; Hamilton to Collectors of Customs, 1793, 1 Am. State Papers, Foreign Relations, p. 140; Jefferson's opinion, 6 Jefferson's Writings, p. 223; Jefferson to Genet, *re The Fanny*, 1793, l. c. 329, note. See also questions and opinion formulated by Jefferson for the Cabinet, 1793, l. c. 351, 370, and his letters to Morris and the British Minister, same year, l. c. 383, 423, 444. See further Washington's Message of December 3, 1793, 1 Messages of the Presidents (Rich-

ardson), p. 139; *Solderondo v. The Nostra Signora*, 21 Fed. Cas. 225; *Reid v. Vere*, 20 Fed. Cas. 488. See the treaties of like purpose and effect with *The Netherlands,* October 8, 1782, Molloy, vol. 2, pp. 1238, 1239; 3 Wharton, International Law, p. 527; and with Sweden, April 3, 1783, Molloy, vol. 2, p. 1732, the latter taken as a model by Prussia. 8 Works of John Adams, pp. 183, 191, 193. Further as to the purpose and history of the Prussian Treaty: Franklin and Deane to Continental Congress, 1777, 2 Wharton, Diplomatic Correspondence, American Revolution, p. 322; Lee's letter from Berlin, 1777, 2 Sparks' Diplomatic Correspondence, American Revolution, p. 88; Baron Schulenburg to Lee, 1778, 2 Wharton, Diplomatic Correspondence, American Revolution, p. 472; Adams, Franklin and Jefferson to Baron Thulemeier, 1785, 2 Diplomatic Correspondence of the United States, p. 276; the latter's reply, 1785, l. c. 304; Washington to Rochambeau, 1786, 9 Sparks' Writings of Washington, pp. 182, 183; Hamilton, 1795, 5 Hamilton's Works (ed. Henry Cabot Lodge), p. 113.

Article XIX of the first Prussian Treaty, modified in 1799, was revived by the Treaty of 1828, excluding the provision which related to prizes made on British subjects. The letters exchanged March 31 and April 4, 1916, between the British Ambassador and the Secretary of State (Diplomatic Correspondence, European War, Department of State, No. 3, pp. 341 *et seq.*), show a definite ruling by our political department that the presence of the *Appam* in our waters did not violate neutrality. The treaty, as re-enacted in 1828, is undoubtedly still in force.

The municipal law of the United States is in accord with international law as declared by this court. 35 Stat. 1090, 1091; Fenwick, Neutrality Laws of the United States, c. 2, p. 26; 1 Am. State Papers, p. 140.

The neutrality proclamations of the United States are

in accord with its municipal law and with general international law. Having failed to interdict the entrance of prizes into our ports, permission to enter must be assumed. Our traditional policy, differing from that of Europe, but adhered to in this war and throughout our history, is not to forbid asylum for prizes. Montague Bernard's Neutrality of Great Britain during the American Civil War (London, 1870), pp. 133, 145 *et seq.*

It has consistently been held, that in the absence of express prohibition, prizes may enter and remain in neutral ports. 7 Ops. Atty. Gen. 122; Moore's International Law Digest, vol. 7, p. 982; Twiss, Law of Nations, 2d ed., vol. 2, pp. 453, 454; Hall, International Law, 5th ed., p. 618; Halleck, International Law, 1st ed., p. 523; Calvo, Le Droit International Theorique et Pratique, 3d ed. (1880), vol. 3, p. 498; *The Exchange,* 7 Cranch, 116.

The questions at issue are not affected by the provisions of the Hague Convention. The Hague Conventions do not necessarily declare existing law, they may change it. Scott's Texts of Hague Peace Conferences, 1899–1907, Intro., pp. ix, xix; Preamble to Convention XIII, Scott's Hague Peace Conferences, vol. 2, p. 507. Expressly, these rules are subject to existing treaties. They apply only if all belligerents are parties to the Convention. Article 28, *id.,* p. 519. Great Britain and Turkey have not ratified; Convention XIII therefore does not apply. *The Farn Case,* Mr. Lansing to British Ambassador, Diplomatic Correspondence, European War, Department of State, No. 2, p. 140. The convention may not be taken as evidence in the face of the consistent policy of this country maintained by all branches of its government and never reversed. Besides, the Convention, taken literally, does not deny permission to enter, and no penalty could fall, under Art. 21, until after notice, which has never been given.

*Mr. Frederic R. Coudert* and *Mr. James K. Symmers*, with whom *Mr. Howard Thayer Kingsbury*, *Mr. Herbert Barry*, *Mr. Floyd Hughes*, *Mr. Ralph James M. Bullowa* and *Mr. Munroe Smith* were on the briefs, for appellees:

Unless they are expressly excluded, prizes may seek temporary shelter in a neutral port, but not permanent or indefinite asylum. This rule is the product of a long course of historical development in the various maritime countries. French Ordinances of 1543, 1674 and 1689; French Prize Code of 1784. See Naval War College, International Law Situations, 1908, p. 54, and appendix to 5 Wheaton, 52–58. In 1650, and again in 1681, France prohibited the stay of foreign prizes in her ports for more than twenty-four hours. Pistoye & Duverdy, Traité des Prises Maritimes, vol. 2, pp. 449, 452. This is, perhaps, the origin of the twenty-four hour limitation for belligerent war vessels in neutral ports. Edict of the States General of Holland of November 7, 1658, in note to *The Josefa Segunda*, 5 Wheat. 349, citing Duponceau's Translation of Bynkershoek. The English authorities recognize the same general rule. *The Flad Oyen*, 1 C. Rob. 135; *The Henrick and Maria*, 4 C. Rob. 43; *The Polka*, Spinks, Ecclesiastical and Admiralty Reports, p. 447. The German Prize Code expressly recognizes it, Huberich & King, pp. 64, 65. There is a striking agreement of opinion among the leading text-writers. Wheaton's Treatise on Capture (1815), pp. 262, 263; Wheaton, International Law, 8th Am. ed., § 391, note; Hall, International Law, 5th ed., p. 618; Westlake, International Law, part 2, p. 215; Risley, The Law of War, p. 176; Dr. James Brown Scott, in American Journal of International Law, January, 1916, pp. 104–112; Bluntschli, International Law, § 778, note.

During our Civil War, our War with Spain, and in the Russo-Japanese War, neutral nations generally either excluded prizes or allowed only temporary entrance in cases

of necessity. Bernard's History of British Neutrality, pp. 137–141; Naval War College, International Law Situations, 1908, pp. 70–73; American Journal of International Law, January, 1916, pp. 109 *et seq.*

The provisions of Arts. 21 and 22 of Convention XIII of the Hague Conference of 1907 are declaratory of the existing law of nations. The express refusal of the United States to accede to Art. 23 was notice to the world that this country would not allow the sequestration of prizes in our ports. The policy of the United States, as well as that of Great Britain, is clearly shown by Arts. 21 and 22 which were signed, adhered to or ratified by forty-three of the powers. This is indicative of the very general agreement among the nations that these articles declared existing international law. The German Prize Code is equally convincing.

Article 23 is evidently inconsistent with Arts. 21 and 22 and contrary to the general rule of neutrality and the modern practice developed by the nations. The attitude of the United States in its reservation indicates its disavowal of the proposed innovation. In the proceedings of the Convention that article was decided upon as a compromise measure. While all agreed on 21 and 22 as expressing existing law, Art. 23 was debated as an innovation, and from the standpoint of policy. These debates disclose the fact that Great Britain and the United States stood for the codification of existing international law as finally embodied in 21 and 22; Germany also acquiesced, proposing to add to the original draft of Art. 21 the words: "for lack of provisions or fuel." This amendment was accepted. The German delegation evidently followed the view of their government as now embodied in their present Prize Code.

The adhesion of the United States to Arts. 21 and 22 was clearly no accidental compromise, but was done in pursuance of the fixed policy of this country and that

of other nations, as shown by their definitely proclaimed practice, at least since the middle of the nineteenth century.   As pointed out in Oppenheim on International Law, vol. 2, pp. 395–397, only by adhering to this practice can neutrality be preserved.

After the termination of the Revolutionary War and as a consequence of our Treaties with France of 1778, numerous and protracted difficulties arose in regard to the bringing by French vessels into American ports of prizes.   At that time it was permissible to give to one power or another certain privileges available in wartime. In discussing these treaties it must be remembered that the evolution of the law of neutrality, which has taken place since, especially as a consequence of these exclusive privileges given by the United States to France, wholly negatives this ancient view.  ' The fundamental postulate of neutrality to-day is complete impartiality between the belligerents.   This rule, embodied in the original statutes of the United States, and since so firmly adhered to, is not founded upon "bookish theoric" but is the resultant of painful national experience.   McMaster's History of the People of the United States, vol. 2, pp. 103, 136; *Gray* v. *United States*, 21 Ct. Clms. 340, 360, 384; Moore on International Arbitrations, vol. 4, p. 3967.

The first act in the drama was Washington's proclamation of neutrality.   The .difficulty in maintaining it was largely due to the embarrassing position in which the United States was involved by having accorded to France exclusive treaty privileges, and especially the provision allowing such use of its ports as was necessarily incompatible with impartiality.   *Id.*, pp. 3970–3977; *The Betsey*, 3 Dall. 6; *The Vrow Christina Magdalena*, Bee, 11, Fed. Cas. No. 7216.   The case of *The Betsey*, not only over- ruled all the decisions of the lower courts refusing jurisdiction in this class of cases, but established at that early date (1794) the proposition that the courts of the United

States had power to enforce and vindicate international law.' The French treaty clause was in vain invoked as excluding the jurisdiction of the court, precisely as the claimants here invoke the similar Prussian treaty clause.

The decision in the *Betsey Case* was followed on June 5, 1794, by the Neutrality Act, which, with some additions, has remained the law up to the present time. This act sought to meet the difficulties that had arisen out of the great European struggle and had for its object the declaration and codification of the policy followed by Washington and Jefferson and based by them upon the law of nations.

The construction placed by the executive upon the clauses allowing prizes to be taken into American ports, as set forth in Mr. Jefferson's letter to Gallatin, August 28, 1801, Moore's International Law Digest, vol. 7, § 1302, pp. 935, 936, and again by Mr. Pickering, Secretary of State, in 1796, *id.*, 936, make it apparent that under the interpretation placed upon the clause of the French treaty, similar to that of the Prussian treaty, now in question, little more was granted to the vessel and her prize than would now be allowed under the law as declared by Art. 21 of the Hague Convention XIII. It is idle to endeavor now to interpret the Prussian treaty by reference to the letters *inter sese* of the distinguished Americans who were engaged in the effort to persuade Prussia to make it.

War vessels with or without prizes might have been absolutely excluded from our ports; by treaties with some nations we allowed them temporary shelter. We refused to consider this temporary shelter as an asylum, and the treaties, even where applicable, were thus interpreted in a fashion not inconsistent with fair neutrality. Attorney General Wirt, 2 Ops. Atty. Gen. 86; Attorney General Cushing, 7 Ops. Atty. Gen. 212; Clay, Secretary of State, Moore's International Law Digest, vol. 7, p. 937;

Mr. Seward to Peruvian Legation, *id.*, p. 938; Attorney General Cushing, 7 Ops. Atty. Gen. 122. For the so-called Bergen prizes, see Moore's International Law Digest, § 1314; Act of March 28, 1806, 6 Stat. 61. The prizes were brought into Bergen under stress of weather and for necessary repairs. No precedent was created except one against the right of asylum.

There are certain other early treaties which show that, where it was intended to give or secure any greater privileges than those clearly expressed in the Prussian treaty, appropriate language was used. Treaty with Algiers, 1798, Arts. IX, X; Treaty with Algiers, 1816, Art. XVIII; Treaty with The Netherlands, 1782, Art. V; Treaty with Sweden, 1783, Arts. XVIII, XIX. See summary of treaties in regard to prizes in neutral ports in Phillmore's International Law, vol. 3, § 380.

The courts of admiralty of a neutral country have jurisdiction of a suit by the owner of a prize which has been brought into a port of the neutral, and may award restitution when there has been a violation of neutrality on the part of the captor, whether inherent in the capture, or prior or subsequent thereto. *Palachi's Case,* 1 Rolle, 175, 3 Bulstrode, 27; Lex Mercatoria (London, 1729), p. 179; Molloy's De Jure Maritimo, vol. 1, pp. 14, 15, 58; Laws of the Admiralty (London, 1767), vol. 1, p. 219; *The Betsey,* 3 Dall. 6; *The Santissima Trinidad,* 1 Brock. 478, Fed. Cas. No. 2568; affirmed in 7 Wheat. 283; *The Exchange,* 7 Cranch, 116; *The Invincible,* 1 Wheat. 238; *The Divina Pastora,* 4 Wheat. 52; *The Estrella,* 4 Wheat. 298; *La Amistad de Rues,* 5 Wheat. 385; *The Arrogante Barcelones,* 7 Wheat. 496; and other cases. *Queen* v. *The Chesapeake,* 1 Oldright (Nova Scotia), 797; *La Reine des Anges,* Stewart's Admiralty Rep. (Nova Scotia), 11; *The Purissima Concepcion,* 6 Rob. 45; *The Vrow Anna Catharine,* 5 Rob. 15; *The Eliza Ann,* 1 Dods. 244; *The Diligentia,* 1 Dods. 404; *The Twee Gebroeders,*

3 Rob. 161; *The Anna,* 5 Rob. 373; *The Sir William Peel,* 5 Wall. 517; *The Florida,* 101 U. S. 37.

In the case at bar the violation of neutrality was subsequent to the act of capture and was a deliberate attempt to use an American port as a naval base for the safekeeping of the prize during the war. The time of the violation of neutrality is immaterial; there has been a violation and the prize has been voluntarily brought within the jurisdiction of the American courts. The power and duty to make restitution follow as a matter of course.

The Prussian treaties of 1799 and 1828 do not apply. Examination of the French and English texts shows that these and the contemporary treaties with Sweden, France and England, apply only to prizes which are brought into port by vessels of war. They constitute exceptions and necessitate strict construction. They contemplate merely a temporary stay for some particular necessity and do not permit a neutral port of refuge to be made a port of ultimate destination or of indefinite asylum. Opinion of Secretary of State, March 2, 1916. The French text of the Prussian Treaty of 1799 is free from the ambiguity that appellants impute to the English. Appellants' historical review of the negotiations for the treaty actually militates against their own contentions. The convoy of a war vessel to protect its prizes was insisted upon as essential because, as the Prussian sovereign pointed out, some of his principal ports were not fortified, and he therefore could not protect a prize which came in for shelter without a war vessel to defend it against hostile attack.

The German ambassador expressly admitted in his memorandum for the State Department that the Prussian Treaty of 1799 "made it necessary that the prize was brought into port by the capturing vessel," and contended for a wider application in view of ".the development of modern cruiser warfare."

Complete title to a prize, whether neutral or belliger-

ent, does not fully vest in the captor until the prize has been brought into one of the captor's ports and duly condemned by a competent prize court of the captor's country. Until then the prize may be lost by recapture, abandonment or violation of another nation's neutrality. Prior to such condemnation the captor has merely a right *ad rem* and no right *in re;* in other words, merely that limited right which possession gives until by condemnation *dominium* or plenary title is acquired. Amos, Roman Civil Law, pp. 157, 158. There is considerable diversity among the early authorities on this question. Grotius, Liber 3, c. 6, § 3, note 3; Bynkershoek's Treatise on the Law of War, Du Ponceau's Translation, c. 5, p. 41; Burlamaqui, Principles of Politic Law, Part 4, c. 7, §§ 15–18; Richard Lee, Treatise of Captures in War, pp. 82, 96; *Goss v. Withers,* 2 Burrow's Rep. 638; *Assievedo v. Cambridge,* 10 Mod. 77; March's New Cases, p. 110; Wooddeson's Lectures, vol. 2, p. 274; *The Flad Oyen,* 1 C. Rob. 135.

The American rule requires that the captured vessel be brought within the jurisdiction of the captor's country in order to divest the title of the original owners, and that a sentence of condemnation be duly pronounced by a competent court. Attorney General Lee, 1 Ops. Atty. Gen. 78; *Stewart v. United States,* 1 Ct. Clms. 113, 119; *Manila Prize Cases,* 188 U. S. 254, 260, 278. See also *Miller v. The Resolution,* 2 Dall. 1; *The Nassau,* 4 Wall. 634, 641.

It seems clear from the language of *The Adventure,* 8 Cranch, 221, that, even assuming that the capture, of itself, divested their property, leaving only a *spes recuperandi,* all the rights of the British owners were revived the moment the *Appam* was brought by the prize-master into our neutral waters.

Leading French, German and English commentaries are in agreement that until condemnation the original owner's rights are never finally extinguished but merely

remain in abeyance. Bluntschli, International Law Codi-
fied, paragraphs 739, 740, 741, 860; Bonfils, Manuel de
Droit International Public (Paris, 1914), paragraphs 1416,
1420; Wheaton, International Law (Phillipson, 1916),
p. 581; Oppenheim, International Law, vol. 2, § 196;
Upton, Maritime Warfare and Prize (1861); Rev. Stats.,
§ 4652; *Oakes* v. *United States,* 30 Ct. Clms. 378; *The
Star,* 3 Wheat. 86; *The Beaver,* 3 C. Rob. 292; "The Emily
St. Pierre" and "The Experience," Dana's notes to
Wheaton, pp. 474, 475; U. S. Diplomatic Correspondence,
1862, pp. 75–148. See Pitt Cobbett, Leading Cases on
International Law (1913), pp. 204, 205.

In any event, as held in the case of *The Santissima Trini-
dad,* 7 Wheat. 355, the pendency of prize proceedings in a
foreign court cannot be set up against the jurisdiction of
our courts to deal with a *res* actually in their custody.
The case of *The Mary Ford,* 3 Dall. 188, is not a controll-
ing authority. This decision was rendered in 1794, when
the whole law of prize was in a very unsettled condition.
The conclusion reached is entirely inconsistent with the
later decision in the case of *The Adventure, supra.*

The *Appam* is not a German public vessel or entitled
to the exemptions of a public vessel. An uncondemned
prize stands in a category by herself. She may, after
condemnation, be sold to a private purchaser and become
a private vessel under new ownership, or she may be ap-
propriated to public uses, pacific or belligerent. She
may, in certain exceptional cases, be converted into a
public vessel even before condemnation. But to effect
this she must be regularly commissioned as such by some
competent authority. She may then become entitled to
the exemptions of a public vessel. *The Exchange,* 7 Cranch,
116. As to the case of *The Farn,* see Diplomatic Corre-
spondence, European War, Department of State, No. 2,
pp. 139, 140. *The Tuscaloosa* was restored expressly on
the ground that she had been commissioned as a ship of

war, and converted into a tender to the *Alabama*. Semmes, Memoirs of Service Afloat, pp. 739–743; Molloy, Treaties, &c., 1776–1909, vol. 1, p. 721.

Nothing whatever has been done to take the *Appam* out of the category of prize, and convert her into a public vessel, or devote her to public use. She would not, as a German public vessel, bring several hundred prisoners to the United States for the purpose of setting them free. She could not bring them here to hold them as prisoners in our waters without manifestly violating our neutrality, as she in fact did in this respect, and the express prohibition of the American statutes. Rev. Stats., § 5286. The neutrality regulations applicable to the Panama Canal Zone, referred to by appellants, merely provide that in passing through the Canal prizes shall be subject to the same restrictions as war vessels. This does not constitute a recognition of prizes as public vessels. Moreover, such use of the Canal is necessarily temporary.

The sending of a prize to a neutral port with a prize crew insufficient to navigate her, and with intention to lay her up, is equivalent to an abandonment and thereby divests the captors' inchoate right. To hold a capture merely by putting on board a prize-master, with or without a small crew, the prize-master must actually bring the prize into a home port for condemnation. *The Alexander*, 8 Cranch, 169; *Wilcocks* v. *Union Ins. Co.*, 2 Binney, 574, 578; Attorney General Grundy, 3 Ops. Atty. Gen. 377.

Under the prize laws of the United States, the failure to bring proceedings with due diligence in a competent court for an adjudication of prize is in itself ground for the release of the vessel. Rev. Stats., § 2645.

In like manner, the German Prize Code provides for the bringing of proceedings for condemnation in due season. Here the *res* is in the custody of our court, and the pendency of proceedings in a German prize court is

mere *brutum fulmen*, under the decision in *The Santissima Trinidad*, 7 Wheat. 355.

Restitution to the owner is the appropriate and only adequate remedy. The inquiry to be made by our courts is whether the prize was brought in for permitted purposes, and, if so, whether she remains longer than her necessities require. If she acts otherwise, then she is, in the language of the Hague Convention, to be "released." If released, she must necessarily revert to her owners, since the temporary adverse possession of the captors is thus removed. This, however, was no new invention of the Hague Conference. Its roots go back at least to the Edict of the States General of Holland of 1658, already cited, which expressly provided that, in such event:

"The prize should be restored to the former owners as though it had never been taken." Consolato del Mare, Benedict's Admiralty, § 119. See Diplomatic Correspondence, European War, Department of State, No. 2, p. 141. If internment were the only remedy, the captor's chief purpose, of securing a place of safe-keeping for his spoils, would be accomplished. Moreover, the German Government has expressly disclaimed and objected to internment in this case.

That restitution is made by court decree rather than by executive action is the result of the historic development of our judicial and diplomatic precedents. The remedies are concurrent; but for many years it has been the policy of this government to leave such questions to the courts rather than to dispose of them summarily by executive action. (See Chief Justice Marshall's opinion, in the Circuit Court in *The Santissima Trinidad, supra.*)

MR. JUSTICE DAY delivered the opinion of the court.

These are appeals from the District Court of the United States for the Eastern District of Virginia, in two ad-

miralty cases. No. 650 was brought by the British & African Steam Navigation Company, Limited, owner of the British steamship, *Appam*, to recover possession of that vessel. No. 722 was a suit by the master of the *Appam* to recover possession of the cargo. In each of the cases the decree was in favor of the libellant.

The facts are not in dispute and from them it appears: That during the existence of the present war between Great Britain and Germany, on the fifteenth day of January, 1916, the steamship *Appam* was captured on the high seas by the German cruiser, *Moewe*. The *Appam* was a ship under the British flag, registered as an English vessel, and is a modern cargo and passenger steamship of 7800 tons burden. At the time of her capture she was returning from the West Coast of Africa to Liverpool, carrying a general cargo of cocoa beans, palm oil, kernels, tin, maize, sixteen boxes of specie, and some other articles. At the West African port she took on 170 passengers, eight of whom were military prisoners of the English Government. She had a crew of 160 or thereabouts, and carried a three-pound gun at the stern. The *Appam* was brought to by a shot across her bows from the *Moewe*, when about a hundred yards away, and was boarded without resistance by an armed crew from the *Moewe*. This crew brought with them two bombs, one of which was slung over the bow and the other over the stern of the *Appam*. An officer from the *Moewe* said to the captain of the *Appam* that he was sorry he had to take his ship, asked him how many passengers he had, what cargo, whether he had any specie, and how much coal. When the shot was fired across the bows of the *Appam*, the captain instructed the wireless operator not to touch the wireless instrument, and his officers not to let any one touch the gun on board. The officers and crew of the *Appam*, with the exception of the engine-room force, thirty-five in number, and the second officer, were ordered

on board the *Moewe*. The captain, officers and crew of the *Appam* were sent below, where they were held until the evening of the seventeenth of January, when they and about 150 others, officers and crews of certain vessels previously sunk by the *Moewe*, were ordered back to the *Appam* and kept there as prisoners. At the time of the capture, the senior officer of the boarding party told the chief engineer of the *Appam* he was now a member of the German navy; if he did not obey orders his brains would be blown out, but if he obeyed, not a hair of his head should be touched. The *Appam's* officer was instructed to tell his staff the same thing, and if they did not obey orders they would be brought to the German officer and shot. Inquiries were made by the German officer in command of the *Appam* as to revolutions of the engines, the quantity of coal on hand and the coal consumption for different speeds, and instructions were given that steam be kept up handy, and afterwards the engineer was directed to set the engines at the revolutions required, and the ship got under way.

Lieutenant Berg, who was the German officer in command of the *Appam* after its capture, told the engineer on the second morning that he was then in charge of the ship, asked of him information as to fuel consumption, and said that he expected the engineer to help him all he could, and the more he did for him the better it would be for everybody on the ship. The engineer said he would, and did so. The engines were operated with a bomb secured to the port main injector valve, and a German sailor stationed alongside the bomb with a revolver. There was a guard below of four or five armed Germans, who were relieved from time to time, but did not interfere with the working of the ship. The German officer, Lieutenant Berg, gave directions as to working the engines, and was the only officer on board who wore a uniform.

On the night of the capture, the specie in the specie-room was taken on board the *Moewe*. After Lieutenant Berg took charge of the *Appam*, bombs were slung over her bow and stern, one large bomb, said to contain about two hundred pounds of explosive, was placed on the bridge, and several smaller ones in the chart room. Lieutenant Berg informed the captain of the *Appam*, pointing to one of the bombs, "That is a bomb; if there is any trouble, mutiny, or attempt to take the ship, I have orders to blow up the ship instantly." He also said, "There are other bombs about the ship; I do not want to use them, but I shall be compelled to if there is any trouble." The bombs were kept in the positions stated until the ship arrived at the Virginia Capes, when they were removed. Lieutenant Berg, on reaching Hampton Roads, asked the crew of the *Appam* to drop the anchor, as he had not men to do it.

During the trip to the westward, the officers and crew of the *Appam* were not allowed to see the ship's compass to ascertain her course, and all lights were obscured during the voyage. The German prisoners, with the exception of two who went on board the *Moewe*, were armed and placed over the passengers and crew of the *Appam* as a guard all the way across. For two days after the capture, the *Appam* remained in the vicinity of the *Moewe*, and then was started westward. Her course for the first two or three days was southwesterly, and afterwards westerly, and was continued until her arrival at the Virginia Capes on the thirty-first of January. The engine-room staff of the *Appam* was on duty operating the vessel across to the United States; the deck crew of the *Appam* kept the ship clean, and the navigation was conducted entirely by the Germans, the lookouts being mostly German prisoners.

At the time of the capture, the *Appam* was approximately distant 1,590 miles from Emden, the nearest German port; from the nearest available port, namely,

Punchello, in the Madeiras, 130 miles; from Liverpool, 1,450 miles; and from Hampton Roads, 3,051 miles. The *Appam* was found to be in first class order, sea-worthy, with plenty of provisions, both when captured and at the time of her arrival in Hampton Roads.

The order or commission delivered to Lieutenant Berg by the commander of the *Moewe* is as follows:

"Information for the American Authorities. The bearer of this, Lieutenant of the Naval Reserve Berg, is appointed by me to the command of the captured English steamer 'Appam,' and has orders to bring this ship into the nearest American harbor, and there to lay up. Kommando S. M. H. Moewe. Count Zu Dohna, *Cruiser Captain and Commander.* (Imperial Navy Stamp:) Kommando S. M. H. Moewe."

Upon arrival in Hampton Roads, Lieutenant Berg reported his arrival to the Collector, and filed a copy of his instructions to bring the *Appam* into the nearest American port and there to lay up.

On February 2d, His Excellency, the German Ambassador, informed the State Department of the intention, under alleged treaty rights, to stay in an American port until further notice, and requested that the crew of the *Appam* be detained in the United States for the remainder of the war.

The prisoners brought in by the *Appam* were released by order of the American Government.

On February 16th, and sixteen days after the arrival of the *Appam* in Hampton Roads, the owner of the *Appam* filed the libel in case No. 650, to which answer was filed on March 3d. On March 7th, by leave of court, an amended libel was filed, by which the libellant sought to recover the *Appam* upon the claim that holding and detaining the vessel in American waters was in violation of the law of nations and the laws of the United States and of the neutrality of the United States. The answer of the

respondents to the amended libel alleged that the *Appam* was brought in as a prize by a prize master, in reliance upon the Treaty of 1799 between the United States and Prussia; that by the general principles of international law the prize master was entitled to bring his ship into the neutral port under these circumstances, and that the length of stay was not a matter for judicial determination; and that proceedings had been instituted in a proper prize court of competent jurisdiction in Germany for the condemnation of the *Appam* as a prize of war; and averred that the American court had no jurisdiction.

The libel against the *Appam's* cargo was filed on March 13th, 1916, and answer filed on March 31st. During the progress of the case, libellant moved the court to sell a part of the cargo as perishable; on motion the court appointed surveyors, who examined the cargo and reported that the parts so designated as perishable should be sold; upon their report orders of sale were entered, under which such perishable parts were sold, and the proceeds of that sale, amounting to over $600,000, are now in the registry of the court, and the unsold portions of the cargo are now in the custody of the marshal of the Eastern District of Virginia.

The argument in this case has taken wide range, and orally and in printed briefs counsel have discussed many questions which we do not consider necessary to decide in determining the rights involved in these appeals.

From the facts which we have stated, we think the decisive questions resolve themselves into three: First, was the use of an American port, under the circumstances shown, a breach of this Nation's neutrality under the principles of international law? Second, was such use of an American port justified by the existing treaties between the German Government and our own? Third, was there jurisdiction and right to condemn the *Appam* and her cargo in a court of admiralty of the United States?

It is familiar international law that the usual course after the capture of the *Appam* would have been to take her into a German port, where a prize court of that Nation might have adjudicated her status, and, if it so determined, condemned the vessel as a prize of war. Instead of that, the vessel was neither taken to a German port, nor to the nearest port accessible of a neutral power, but was ordered to, and did, proceed over a distance of more than three thousand miles, with a view to laying up the captured ship in an American port.

It was not the purpose to bring the vessel here within the privileges universally recognized in international law, i. e., for necessary fuel or provisions, or because of stress of weather or necessity of repairs, and to leave as soon as the cause of such entry was satisfied or removed. The purpose for which the *Appam* was brought to Hampton Roads, and the character of the ship, are emphasized in the order which we have quoted to take her to an American port and there lay her up and in a note from His Excellency, The German Ambassador, to the Secretary of State, in which the right was claimed to keep the vessel in an American port until further notice, (Diplomatic Correspondence with Belligerent Governments Relating to Neutral Rights and Duties, Department of State, European War No. 3, p. 331,) and a further communication from the German Ambassador forwarding a memorandum of a telegram from the German Government concerning the *Appam* (*Idem*, p. 333), in which it was stated:

"*Appam* is not an auxiliary cruiser but a prize. Therefore she must be dealt with according to Article 19 of Prusso-American treaty of 1799. Article 21 of Hague Convention concerning neutrality at sea is not applicable, as this convention was not ratified by England and is therefore not binding in present war according to Article 28. The above-mentioned Article 19 authorizes a prize ship to remain in American ports as long as she

pleases. Neither the ship nor the prize crew can therefore be interned nor can there be question of turning the prize over to English."

In view of these facts, and this attitude of the Imperial Government of Germany, it is manifest that the *Appam* was not brought here in any other character than as a prize, captured at sea by a cruiser of the German navy, and that the right to keep her here, as shown in the attitude of the German Government and in the answer to the libel, was rested principally upon the Prussian-American Treaty of 1799.

The principles of international law recognized by this Government, leaving the treaty aside, will not permit the ports of the United States to be thus used by belligerents. If such use were permitted, it would constitute of the ports of a neutral country harbors of safety into which prizes, captured by one of the belligerents, might be safely brought and indefinitely kept.

From the beginning of its history this country has been careful to maintain a neutral position between warring governments, and not to allow the use of its ports in violation of the obligations of neutrality; nor to permit such use beyond the necessities arising from the perils of the seas or the necessities of such vessels as to sea-worthiness, provisions and supplies. Such usage has the sanction of international law, Dana's Note to Wheaton on International Law, 1866, 8th American Edition, § 391, and accords with our own practice. Moore's Digest of International Law, vol. 7, 936, 937, 938.

A policy of neutrality between warring nations has been maintained from 1793 to this time. In that year President Washington firmly denied the use of our ports to the French Minister for the fitting out of privateers to destroy English commerce. This attitude led to the enactment of the Neutrality Act of 1794, afterwards embodied in the Act of 1818, enacting a code of neutrality,

which among other things inhibited the fitting out and arming of vessels; the augmenting or increasing of the force of armed vessels; or the setting on foot in our territory of military expeditions; and empowering the President to order foreign vessels of war to depart from our ports and compelling them so to do when required by the law of nations.   Moore on International Arbitrations, vol. 4, 3967 *et seq.*

This policy of the American Government was emphasized in its attitude at the Hague Conference of 1907. Article 21 of the Hague Treaty provides:

"A prize may only be brought into a neutral port on account of unseaworthiness, stress of weather, or want of fuel or provisions.

"It must leave as soon as the circumstances which justified its entry are at an end.   If it does not, the neutral Power must order it to leave at once; should it fail to obey, the neutral Power must employ the means at its disposal to release it with its officers and crew and to intern the prize crew."

Article 22 provides:

"A neutral Power must, similarly, release a prize brought into one of its ports under circumstances other than those referred to in Article 21."

To these articles, adherence was given by Belgium, France, Austria-Hungary, Germany, the United States, and a number of other nations.   They were not ratified by the British Government.   This Government refused to adhere to Article 23, which provides:

"A neutral Power may allow prizes to enter its ports and roadsteads, whether under convoy or not, when they are brought there to be sequestrated pending the decision of a Prize Court.   It may have the prize taken to another of its ports.

"If the prize is convoyed by a war-ship, the prize crew may go on board the convoying ship.

"If the prize is not under convoy, the prize crew are left at liberty."

And in the proclamation of the convention the President recited the resolution of the Senate adhering to it, subject to the "reservation and exclusion of its Article 23 and with the understanding that the last clause of Article 3 of the said Convention implies the duty of a neutral power to make the demand therein mentioned for the return of a ship captured within the neutral jurisdiction and no longer within that jurisdiction." 36 Stat., Pt. II, p. 2438.

While this treaty may not be of binding obligation, owing to lack of ratification, it is very persuasive as showing the attitude of the American Government when the question is one of international law; from which it appears clearly that prizes could only be brought into our ports upon general principles recognized in international law, on account of unseaworthiness, stress of weather, or want of fuel or provisions, and we refused to recognize the principle that prizes might enter our ports and roadsteads, whether under convoy or not, to be sequestrated pending the decision of a prize court. From the history of the conference it appears that the reason for the attitude of the American delegates in refusing to accept Article 23 was that thereby a neutral might be involved in participation in the war to the extent of giving asylum to a prize which the belligerent might not be able to conduct to a home port. See Scott on Peace Conferences, 1899–1907, vol. II, p. 237 *et seq.*

Much stress is laid upon the failure of this Government to proclaim that its ports were not open to the reception of captured prizes, and it is argued that having failed to interdict the entrance of prizes into our ports permission to thus enter must be assumed. But whatever privilege might arise from this circumstance it would not warrant the attempted use of one of our ports as a place in which to store prizes indefinitely, and certainly not where no

means of taking them out are shown except by the aug-
mentation of her crew, which would be a clear violation
of established rules of neutrality.

As to the contention on behalf of the appellants that
Article XIX of the Treaty of 1799 justifies bringing in
and keeping the *Appam* in an American port, in the situa-
tion which we have outlined, it appears that in response
to a note from His Excellency, The German Ambassador,
making that contention, the American Secretary of State,
considering the treaty, announced a different conclusion
(Diplomatic Correspondence with Belligerent Govern-
ments, *supra*, p. 335 *et seq.*); and we think this view is
justified by a consideration of the terms of the treaty.
Article XIX of the Treaty of 1799, using the translation
adopted by the American State Department, reads as
follows.

"The vessels of war, public and private, of both parties,
shall carry (*conduire*) freely, wheresoever they please, the
vessels and effects taken (*pris*) from their enemies, with-
out being obliged to pay any duties, charges, or fees to
officers of admiralty, of the customs, or any others; nor
shall such prizes (*prises*) be arrested, searched, or put
under legal process, when they come to and enter the
ports of the other party, but may freely be carried (*con-
duites*) out again at any time by their captors (*le vaisseau
preneur*) to the places expressed in their commissions,
which the commanding officer of such vessel (*le dit vais-
seau*) shall be obliged to show. But conformably to the
treaties existing between the United States and Great
Britain, no vessel (*vaisseau*) that shall have made a prize
(*prise*) upon British subjects shall have a right to shelter
in the ports of the United States, but if (*il est*) forced
therein by tempests, or any other danger or accident of
the sea, they (*il sera*) shall be obliged to depart as soon
as possible." (The provision concerning the treaties
between the United States and Great Britain is no longer

in force, having been omitted by the Treaty of 1828. See Compilation of Treaties in Force, 1904, pp. 641 and 646.)

We think an analysis of this article makes manifest that the permission granted is to vessels of war and their prizes, which are not to be arrested, searched, or put under legal process, when they come into the ports of the high contracting parties, to the end that they may be freely carried out by their captors to the places expressed in their commissions, which the commanding officer is obliged to show. When the *Appam* came into the American harbor she was not in charge of a vessel of war of the German Empire. She was a merchant vessel, captured on the high seas and sent into the American port with the intention of being kept there indefinitely, and without any means of leaving that port for another as contemplated in the treaty, and required to be shown in the commission of the vessel bringing in the prize. Certainly such use of a neutral port is very far from that contemplated by a treaty which made provision only for temporary asylum for certain purposes, and cannot be held to imply an intention to make of an American port a harbor of refuge for captured prizes of a belligerent government. We cannot avoid the conclusion that in thus making use of an American port there was a clear breach of the neutral rights of this Government, as recognized under principles of international law governing the obligations of neutrals, and that such use of one of our ports was in no wise sanctioned by the Treaty of 1799.

It remains to inquire whether there was jurisdiction and authority in an admiralty court of the United States, under these circumstances, to order restoration to an individual owner of the vessel and cargo.

The earliest authority upon this subject in the decisions of this court is found in the case of *Glass* v. *The Sloop Betsey*, 3 Dall. 6, decided in 1794, wherein it appeared that the commander of the French privateer, *The Citizen*

*Genet*, captured as a prize on the high seas the sloop *Betsey* and sent the vessel into Baltimore, where the owners of the sloop and cargo filed a libel in the District Court of Maryland, claiming restitution because the vessel belonged to subjects of the King of Sweden, a neutral power, and the cargo was owned jointly by Swedes and Americans. The District Court denied jurisdiction, the Circuit Court affirmed the decree, and an appeal was prosecuted to this court. The unanimous opinion was announced by Mr. Chief Justice Jay, holding that the District Courts of the United States possessed the powers of courts of admiralty, whether sitting as an instance or as a prize court, and sustained the jurisdiction of the District Court of Maryland, and held that that court was competent to inquire into and decide whether restitution should be made to the complainants conformably to the laws of nations and the treaties and laws of the United States.

The question came again before this court in the case of *The Santissima Trinidad*, decided in 1822, reported in 7 Wheat. 283. In that case it was held that an illegal capture would be invested with the character of a tort, and that the original owners were entitled to restitution when the property was brought within our jurisdiction. The opinion was delivered by Mr. Justice Story, and, after a full discussion of the matter, the court held that such an illegal capture, if brought into the jurisdiction of the courts of the United States, was subject to condemnation and restitution to the owners, and the learned justice said:

"If, indeed, the question were entirely new, it would deserve very grave consideration, whether a claim founded on a violation of our neutral jurisdiction, could be asserted by private persons, or in any other manner than a direct intervention of the government itself. In the case of a capture made within a neutral territorial jurisdiction, it is well settled, that as between the captors and the captured,

the question can never be litigated. It can arise only upon a claim of the neutral sovereign, asserted in his own courts, or the courts of the power having cognizance of the capture itself for the purposes of prize. And by analogy to this course of proceeding, the interposition of our own government might seem fit to have been required, before cognizance of the wrong could be taken by our courts. But the practice from the beginning, in this class of causes, a period of nearly thirty years, has been uniformly the other way; and it is now too late to disturb it. If any inconvenience should grow out of it, from reasons of state policy or executive discretion, it is competent for Congress to apply at its pleasure the proper remedy." (p. 349.)

" . . . Whatever may be the exemption of the public ship herself, and of her armament and munitions of war, the prize property which she brings into our ports is liable to the jurisdiction of our courts, for the purpose of examination and inquiry, and if a proper case be made out, for restitution to those whose possession has been divested by a violation of our neutrality; and if the goods are landed from the public ship, in our ports, by the express permission of our own government, that does not vary the case, since it involves no pledge, that if illegally captured, they shall be exempted from the ordinary operation of our laws." (p. 354.)

In the subsequent cases in this court this doctrine has not been departed from. *L'Invincible*, 1 Wheat. 238, 258; *The Estrella*, 4 Wheat. 298, 308–311; *La Amistad de Rues*, 5 Wheat. 385, 390.

It is insisted that these cases involve illegal captures at sea, or violations of neutral obligation, not arising because of the use of a port by sending in a captured vessel and keeping her there in violation of our rights as a neutral. But we are at a loss to see any difference in principle between such cases and breaches of neutrality of the

character here involved in undertaking to make of an American port a depository of captured vessels with a view to keeping them there indefinitely. Nor can we consent to the insistence of counsel for appellant that the Prize Court of the German Empire has exclusive jurisdiction to determine the fate of the *Appam* as lawful prize. The vessel was in an American port and under our practice within the jurisdiction and possession of the District Court which had assumed to determine the alleged violation of neutral rights, with power to dispose of the vessel accordingly. The foreign tribunal under such circumstances could not oust the jurisdiction of the local court and thereby defeat its judgment. *The Santissima Trinidad, supra,* p. 355.

Were the rule otherwise than this court has frequently declared it to be, our ports might be filled in case of a general war such as is now in progress between the European countries, with captured prizes of one or the other of the belligerents, in utter violation of the principles of neutral obligation which have controlled this country from the beginning.

The violation of American neutrality is the basis of jurisdiction, and the admiralty courts may order restitution for a violation of such neutrality. In each case the jurisdiction and order rests upon the authority of the courts of the United States to make restitution to private owners for violations of neutrality where offending vessels are within our jurisdiction, thus vindicating our rights and obligations as a neutral people.

It follows that the decree in each case must be

*Affirmed.*